IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

LORI GOMEZ, individually, and
as Personal Representative of the
Estate of Phillip Gomez, and as
parent and next friend of Alyssa,
Alexandria and Elijah Gomez, minors,

Plaintiff,

vs.                                                CIVIL NO.  12-964 LFG/KBM

UNITED STATE DEPARTMENT
OF AGRICULTURE and UNITED
STATES FOREST SERVICE,

Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on "The United States'[1] Motion to Dismiss Plaintiff's

Complaint for Lack of Subject Matter Jurisdiction."  [Doc. 29].  The Court carefully considered the

pleadings [Docs. 29, 33, 34], the exhibits, and the pertinent law.  For the reasons below, the Court

grants the United States' motion to dismiss.

Plaintiff Lori Gomez ("Gomez") brings this action individually, as Personal Representative

of the Estate of Phillip Gomez, and as parent and next friend on behalf of minors Alyssa, Alexandria

and Elijah Gomez.  The Complaint is brought under the Federal Tort Claims Act, 28 U.S.C. § 2671,

---

[1]The United States notes that it is incorrectly named in the caption as the U.S. Department of
Agriculture and U.S. Forest Service.  [Doc. 29, at 1.]  The Court makes no determination as to the proper
caption but for purposes of simplicity refers to Defendants as the United States, the government, or just
Defendants.

*et seq.*, and the New Mexico Wrongful Death Act, NMSA 1978, §§ 41-2-1 to 41-2-4.[2] [Doc. 1.] Gomez alleges claims of wrongful death, personal injury, and loss of consortium

## Background[3]

This case arises out of a tragic collision between an automobile and motorcycle that occurred in early November 2008.  Gomez and her husband were traveling west on a motorcycle on U.S. Highway 64 in Taos County, New Mexico.  Highway 64 is a winding two-lane high country mountain highway, with multiple curves and turns.  One lane is designated for eastbound travel; the other for westbound travel. [Doc. 29-1, at 2.] Traffic controls in the area are posted "No Passing" with double yellow lines painted on the road.  Speed enforcement signs are white with printed black letters posting a speed limit of 40mph in both directions.  There are very minimal shoulders on the roadway entering the area of the crash scene. [Id.] The highway meanders through picturesque and beautiful mountain areas through the Carson National Forest and passes in front of the El Nogal Trailhead parking lot.  The parking area is part of U.S. National Forest land, and is the access point for hikers, fishermen, horseback riders, and others who enter the Carson National Forest at the El Nogal Trailhead.

The Complaint alleges that Randy Hoeppner, while driving a truck, attempted to merge into westbound traffic on Highway 64 from the El Nogal ingress/egress area of the parking lot. [Doc. 1, at ¶ 8.] A second car, a 1995 Pontiac Trans-Am, driven by Adam Martinez and traveling at a high rate of speed on Highway 64, was approaching the ingress/egress area of the parking lot from the

---

[2]Claims brought under New Mexico's Wrongful Death Act are torts, and when tortious conduct is asserted against the United States, such claims must come within the strictures of the Federal Tort Claims Act.

[3]The "background" section is taken from pleadings and exhibits of both parties and does not necessarily represent agreement by the parties.

west.  As the Hoeppner truck entered the shoulder of the road and became visible to traffic, Martinez veered into the oncoming, left lane to avoid the Hoeppner truck.  This occurred just as Gomez and her husband were traveling westbound on Highway 64 approaching the El Nogal parking area.  As Martinez swerved onto the opposite lane to avoid Hoeppner's truck, Martinez lost control of the Trans-Am that began skidding sideways toward oncoming traffic and a blind curve to the east of the El Nogal parking lot.  Gomez and her husband were approaching the same curve heading west.  The Trans-Am skidded directly into the motorcycle driven by Phillip Gomez; the motorcycle crashed head-on into the side of Martinez's Trans-Am.  As a result of the collision, Mr. Gomez was killed, and Plaintiff Gomez suffered catastrophic injuries.

The New Mexico State Police subsequently charged Martinez with driving his vehicle "carelessly and heedlessly in willful or wanton disregard of the rights or safety of others and without due caution and circumspection, and at a speed or in a manner so as to endanger or be likely to endanger people or property."  [Doc. 29, Ex. A.]  Ultimately, Martinez was convicted of homicide by vehicle and sentenced to prison. [Id., Ex. B.]

Gomez brings this action against the United States, contending *inter alia* that the United States breached a duty of reasonable care when it renovated El Nogal parking lot by failing to conduct required traffic, construction, or engineering analyses and failing to provide required oversight and approvals by state entities.  [Doc. 1, at ¶ 10.]  As a result of these failures, Gomez contends the parking lot was located in an unsafe area and that the lot's ingress/egress was placed in a spot that posed a foreseeable risk of harm to motorists. [Id., at ¶ 12.]  In addition, Gomez alleges that to the east of the parking lot ingress/egress area, there is limited visibility due to the blind curve. [Id., at ¶ 13.]  According to Gomez, significant tree and brush growth paralleled the highway pavement to the west of the parking lot entrance, within portions of the Forest Service property, that

3

also impeded visibility of exiting drivers and travelers on the roadway. Gomez asserts that the parking lot ingress/egress is inadequately marked and has incorrect or inadequate signage. [Id., at ¶ 14.] She further alleges that there is a history of auto accidents at or near this area.

In sum, Gomez claims that the United States had a duty to "plan, place, construct, maintain and monitor the parking lot and its ingress/egress adjoining U.S. Highway 64;"that it breached its duty to do so; and that it failed to abide by all requirements in locating, studying, maintaining and monitoring the parking lot ingress and egress adjoining U.S. Highway 64.  As a result of these failures, Gomez contends that the accident that took the life of her husband and severely injured her was foreseeable.

The United States contends that this accident was the first reported to the Forest Service at this location.  [Doc. 29, at 4.]  The United States further describes the history of the construction of the parking lot, that it was originally constructed in 1957 as El Nogal Forest Camp, and that the location and angle of the entrance onto Highway 64 apparently was not changed since the original construction although the road was widened and improved in 2004.  [Id.]  In 1990, the United States Forest Service drew up plans to renovate El Nogal Campground and to widen the access point onto Highway 64, but according to the government, it is unclear if those renovations were made.  The United States contends that independent contractors, rather than forest service personnel, constructed any renovations actually made.

In 2004, the Forest Service prepared a design to convert El Nogal Campground into a trailhead parking lot so as to provide convenient and safe access to several trails to discourage stream-side camping and minimize degradation of stream banks.  A number of changes were made with respect to re-seeding vegetation, use of gravel to resurface and minimize impermeable ground, and re-grading to direct runoff.  Picnic tables and fire rings were removed, and the older camping

areas were converted to trail parking.  The contract plans required the contractor to thin and remove vegetation on the slope adjacent to the highway.  The Forest Service did not move the driveway or access to Highway 64, but the design included widening and raising the driveway.  The Forest Service contracted with Stoven Construction to do the renovation.  Forest Service employees did not work on the 2004 renovation.  Thus, the Forest Service contends it cannot be held liable for negligent construction.[4] [Doc. 29, at 5 n.2.]

The United States provides a lengthy discussion of the policies governing improvements on Forest Service lands from 1960 forward in time.  By 1990, according to the United States, Congress passed statutes like MUSYA (Multiple Use Sustained Yield Act of 1960) that governs the management of Forest Service lands, NEPA (National Environmental Policy Act) that sets forth requirements relating to environmental impact of proposed actions, and NFMA (National Forest Management Act) that provides a framework for the Forest Service to manage Forest System lands. Such statutes address balancing interests of forest users along with providing for managing and use of natural resources.  The United States further identifies a number of Forest Service directives that are potentially relevant to the 1990 proposed renovation to the area at issue [Doc. 29, at 7-8.] The government additionally discusses the 2004 design and renovations in relation to various portions of the Forest Service Manual, Forest Service Handbooks and other materials.  For example, the

---

[4]The Court acknowledges the United States' argument that it is not responsible for maintenance of the right-of-way and for failing to cut back trees or shrubs at the pertinent location due to its position that the New Mexico State Highway and Transportation Department ("NMSH&TD") has that responsibility. Similarly, the United States asserts that it cannot be held liable for negligent construction in relation to the 2004 renovation of the El Nogal Campground, as it contracted with Stoven Construction for the renovation. However, these arguments go to the merits of the claims, and the Court addresses only the jurisdictional question in this decision.

United States notes a Forest Plan that states the Forest Service will provide trailhead parking areas and manage the visual quality. [Doc. 29, at 15.]

The United States seeks dismissal of all of Plaintiff's claims based on its assertion that sovereign immunity bars Gomez's lawsuit against it, and that the federal court is without jurisdiction to entertain the lawsuit.  The government acknowledges that the Federal Tort Claims Act provides a limited waiver of sovereign immunity but argues that none of the exceptions to immunity apply under the circumstances of this case.

Gomez contends that the United States incorrectly portrays its actions as merely a modification of a Forest Service parking lot.  Gomez claims that the facts demonstrate the United States made significant alterations within the pertinent highway right-of-way adjoining the El Nogal lot, and that, in doing so, the United States made itself subject to mandatory, non-discretionary requirements for highway modification.  Even if the Court finds the United States acted within its discretionary function, Gomez urges that the government made non-policy based decisions that would not immunize it from Federal Tort Claim Act liability.

<u>Discussion</u>

I.   <u>Legal Standards</u>

A.   <u>Rule 12(b)(1)</u>

A party may move for dismissal under Rule 12(b)(1) based on lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  When a defendant challenges the Court's subject matter jurisdiction, the plaintiff bears the burden of establishing jurisdiction.  <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992); <u>Marcus v. Kan. Dep't of Revenue</u>, 170 F.3d 1305, 1309 (10th Cir. 1999) (party invoking federal jurisdiction bears burden of establishing subject matter jurisdiction).

6

When considering a Rule 12(b)(1) motion to determine subject matter jurisdiction, the court can examine extrinsic evidence.  Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995).  In other words, a Rule 12(b)(1) motion may go beyond the allegations in the complaint and challenge the facts on which subject matter jurisdiction depends.  Id.  When reviewing a factual challenge to subject matter jurisdiction, the court does not accept the allegations in the complaint as true.  Id.  The court has wide discretion to consider evidence outside of the pleadings without converting a Rule 12(b)(1) motion into a motion for summary judgment.  Id.

B.      Federal Tort Claims Act ("FTCA")

The United States typically is immune from liability absent its consent to be sued.  United States v. Mitchell, 445 U.S. 535, 538 (1980).  Unless there is a specific waiver of immunity, sovereign immunity bars suit against the United States and its agencies.  F.D.I.C. v. Meyer, 510 U.S. 471, 475 (1994).  However, the immunity enjoyed by the United States as territorial sovereign is a legal doctrine that has not been favored by the test of time.  Nat'l City Bank of New York v. Republic of China, 348 U.S. 356, 359 (1955).  To ameliorate the harshness of sovereign immunity, which universally protected the federal government from lawsuits, Congress passed the FTCA in 1946.

Under the FTCA, the United States consents to being sued by waiving its immunity to suit and liability for specific actions.  When the United States consents to the lawsuit by limited waiver of immunity in accordance with the FTCA, it can be sued in the same manner as a private individual, with certain limitations.  Daigle v. Shell Oil Co., 972 F.2d 1527, 1537 (10th Cir. 1992); 28 U.S.C. § 2674.

"The FTCA waives sovereign immunity for actions against the United States resulting from injuries caused by the negligent acts of governmental employees while acting in the scope of their

employment."  <u>Garcia v. United States Air Force</u>, 533 F.3d 1170, 1175 (10th Cir. 2008) (*citing* 28

U.S.C. § 1346(b)(1)).  However, "[e]xcluded from this waiver of immunity are claims based on the

performance of 'a discretionary function or duty on the part of a federal agency or an employee of

the Government.'" <u>Id.</u> (*citing* 28 U.S.C. § 2680(a)).

> This "discretionary function exception poses a jurisdictional
> prerequisite to suit, which the plaintiff must ultimately meet as part
> of his overall burden to establish subject matter jurisdiction."  "If the
> discretionary function exception applies to the challenged conduct,
> the United States retains its sovereign immunity and the district court
> lacks subject matter jurisdiction to hear the suit."

<u>Id.</u> at 1175-76 (internal citations omitted).

> The discretionary function exception is designed to protect
> policymaking by the executive and legislative branches of
> government from judicial "second-guessing."  Thus, it "marks the
> boundary between Congress' willingness to impose tort liability upon
> the United States and its desire to protect certain governmental
> activities from exposure to suit by private individuals."  Among those
> activities encompassed by the discretionary function exception are
> "the discretionary acts of the Government acting in its role as a
> regulator of the conduct of private individuals."

<u>Id.</u> at 1176 (internal citations omitted).

Courts apply a two-part test to determine whether certain conduct falls within the

discretionary function exception to the waiver of immunity.  The Court first determines the precise

governmental conduct at issue and whether the conduct was "discretionary," "meaning whether it

was 'a matter of judgment or choice for the acting employee.'" <u>Id.</u> (*citing* <u>Berkovitz v. United States</u>,

486 U.S. 531, 536 (1988).  Conduct is not discretionary where "a federal statute, regulation, or

policy specifically prescribes a course of action for an employee to follow."  <u>Id.</u>  This is true

because, under those circumstances, the employee has no rightful choice but to follow the directive.

<u>Id.</u>  However, if there is no statute, regulation or policy mandating a specific course of conduct, and

8

if the governmental actor or agency can exercise some degree of discretion, or employ its own judgment regarding a course of action, then the discretionary function exception to a waiver of immunity is applicable.

If this first element of the test is met, the Court then considers if the decision in question requires "the exercise of judgment based on considerations of public policy." Id. at 1176 (citation omitted). In making this determination, the Court does not consider the employee's "subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." Id. (citation omitted).

The discretionary function exception leaves no room for judicial speculation. Even in instances where the government abused its discretion, its conduct was negligent, or the injury suffered was horrendous as in this case, no relief is available if the discretionary function exception applies. "For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." United States v. Gaubert, 499 U.S. 315, 324-325 (1991). Therefore, the Court must determine "whether the challenged acts . . . are of the nature and quality that Congress intended to shield from tort liability." United States v. Varig Airlines, 467 U.S. 797, 813 (1984). It is the nature of the conduct that is of significance, not the nature of the harm caused by the conduct.

If the Court decides both elements are met, the discretionary function exception to the waiver of sovereign immunity applies and the lawsuit against the United States cannot proceed. Stated differently, even if the government was indeed negligent, and its negligence resulted in a foreseeable injury, or if it abused the discretion it was afforded under the FTCA, there is no liability. Indeed, the Court is without authority to even entertain the lawsuit. Aragon v. United States, 146 F.3d 819

(10th Cir. 1988)   Conversely, however, if Gomez can establish that either element of the two-part test is <u>not</u> met, the lawsuit proceeds.  <u>Garcia</u>, 533 F.3d at 1176  (citation omitted).

**II.**      **Application of the Discretionary Function Exception to Waiver of Immunity**

The parties set out differing versions of "material" or "essential" jurisdictional facts, that contain some overlap.  [Doc. 29, at 15-16; Doc. 33, at 2-4.] The government sets forth a list of federal statutes, regulations, Forest Service directives, manuals, and handbooks, and New Mexico standards that it believes are applicable.  Gomez refers to portions of a few of the government's exhibits as being applicable, but primarily relies on other exhibits she attached to her response, including her expert's report, American Association of State Highway and Transportation Officials' ("AASHTO") provisions, and a Memorandum of Understanding between the State of New Mexico and federal government entities.

The parties agree on the applicable standard for addressing questions of subject matter jurisdiction along with the discretionary function exception to waiver of governmental immunity. Thus, the Court focuses its analysis on whether Gomez provided evidence of a federal statute, regulation, or policy that "specifically prescribes a course of action for an employee to follow." Then the Court examines whether or not the challenged actions are the kind of conduct that can be said to be grounded in the policy of the regulatory scheme.  *See* <u>Baird v. United States</u>, 653 F.2d 437, 440 (10th Cir. 1981), *cert. denied*, 454 U.S. 1144 (1982); *accord*, <u>Smith v. United States</u>, 546 F.2d 872, 875-76 (10th Cir. 1976) ("the discretionary function exception 'poses a jurisdictional prerequisite to suit, which the plaintiff must ultimately meet as part of [her] overall burden to establish subject matter jurisdiction.'").

A.      Whether governmental conduct at issue was a matter of judgment or choice

To prevail on the first prong, Gomez must show that the challenged conduct or decision involved no element of judgment or choice.  Kiehn v. United States, 984 F.2d 1100, 1102 (10th Cir. 1993).  The government argues Gomez did not show that the decisions or conduct at issue depended on a federal statute, regulation, or directive that specifically prescribed a course of action for an employee to follow that was both specific and mandatory.  See Elder v. United States, 312 F.3d 1172, 1177 (10th Cir. 2002).  Thus, the government asserts that the challenged conduct was a matter of discretion, judgment, or choice.

1)      Inaction by Government:

Gomez identifies inaction or a failure to act by the United States.  For example, she alleges that before 2004, Defendants knew the "narrow and windy" nature of the road that made vehicle traffic around the parking lot dangerous and knew there was significant foliage in the area.  When the United States renovated the parking lot in 2004, it made certain changes but allegedly did not conduct traffic studies of the area despite knowledge of complaints about traffic danger. [Doc. 33, at 3.]

These allegations of omissions or inaction do not show that the challenged conduct or decision involved no element of judgment or choice by governmental employees.  Indeed, in Elder, a young boy tragically died in Zion National Park, subsequent to the national park's awareness of at least three earlier, almost identical deaths in the same area.  Notwithstanding certain changes to signage and other alterations, another death occurred.  The national park discussed a number of other safety improvements that could be made but did not implement these changes before the death at issue.  Elder, 312 F.3d at 1175.  Following the boy's death, the park modified certain signage and added warnings, along with installing a rope chain near the pools where the deaths occurred.

11

Notwithstanding the National Park's awareness of earlier, almost identical deaths in the subject area and its failure to take certain precautionary measures to prevent those accidents, this was not sufficient to convince the Court that the government waived its immunity under the FTCA.  Instead, the Court, ultimately decided that the discretionary function exception to a waiver of immunity applied.  Elder, 312 F.3d at 1177.

The Court is not persuaded that Gomez established that the United States knew of earlier accidents or fatalities in the same area and took no precautionary actions.  Moreover, even if she did, evidence of the government's inaction or alleged negligence alone does not demonstrate that the government function at issue was not discretionary.  Stated differently, Gomez must prove more than negligence.  Id., at 1176.

2)  *Specific Standards/Policies/Regulations:*

Gomez relies on the report of her expert, who, in turn, reviewed a Memorandum of Understanding on Procedures Related to State Highways over National Forest Lands (9/1996) ("MOU"), portions of the Code of Federal Regulations ("CFR") relating to forest highways and design standards, New Mexico State Highway and Transportation Department Standard Specifications for Highway and Bridge Construction, the Manual on Uniform Traffic Control Devices ("MUTCD"), AASHTO's Roadside Design Guide and Policy on Geometric Design of Highways and Streets.  In her responsive brief, Gomez emphasizes AASHTO policies and standards. [Doc. 33, at 5.]  The Court addresses each policy or manual relied upon by Gomez.

a.  **AASHTO Policies (Chapters 4 and 9)**

Gomez states that a highway driveway turnout must be constructed to accommodate speed and volume of traffic entering and exiting in accord with AASHTO's policy on geometric design of highways and streets.  She urges that the construction of the turnout must address line of site

12

requirements.  For example, the angle at which the slope of the turnout is structured may impact line of sight issues, and the location of the driveway turnout can also impact driver safety by limiting safe line of sight.  In addition, she contends that federal regulations make mandatory the AASHTO standards for changes to roads and appurtenances that are part of the National Highway System ("NHS") and that the engineering assessments relevant to the AASHTO variables for a driveway turnout were not followed here.  She argues that these regulations were "mandatory, non-discretionary standards" that dictated certain action by Defendants.

In support of this argument, Gomez relies extensively on Exhibit 3 to her response.  Exhibit 3 contains numerous pages from AASHTO-Geometric Design of Highways and Streets, portions of which Gomez highlighted in support of her position.  The Court reviewed all of the highlighted materials.

For example, the AASHTO materials provide that "[w]ell-designed and properly maintained shoulders are needed on rural highways with an appreciable volume of traffic, on freeways, and on some types of urban highways."  [Doc. 33-3, at 3.]  Various advantages are listed in designing such shoulders, including space for motorists: to stop occasionally and consult road maps; make evasive maneuvers to avoid potential crashes; contribute to driving ease and reduced stress; improve sight distance and potentially improving safety; enhance highway aesthetics; encourage  uniform speed; and provide for signs and guardrails. [Id.]

With respect to "Turnouts," Gomez highlighted a portion of the AASHTO materials, stating that the proper design of turnouts should consider turnout length, including entry and exit tapers, the turnout width and location, with respect to horizontal and vertical curves where sight distance is limited.  Turnouts should be located so approaching drivers have a clear view of the entire turnout.

13

If bicycle traffic is expected, turnouts should be paved for ease of use by bicyclists so they can move aside.  [Id., at 4.]

Gomez highlighted "Roadside Control" provisions of the AASHTO provisions, stating, in part, that "it is desirable that the highway authority be empowered to regulate and control the location, design, and operation of access driveways . . . . Such access control minimizes interference to through traffic on the highway."  She also relies on language about "driveways," stating that driveway terminals are low-volume intersections.  Thus, driveway terminals' design and location "merit special consideration."  [Id., at 5.]

She further identifies portions of AASHTO providing that "[d]riveway regulations generally control right-of-way encroachment, driveway location, driveway design, sight distance, drainage, use of curbs, parking, setback, lighting, and signing."  "Sight distance . . . can be limited by the presence of unnecessary roadside structures," such as advertising signs or billboards.  [Id., at 6.]

In the AASHTO section on "Intersections," Gomez highlights "general design considerations and objectives," explaining that the "main objective of intersection design is to facilitate the convenience, ease, and comfort of people traversing the intersection while enhancing the efficient movement of motor vehicles . . . ."  This section lists five elements to be considered in intersection design, including human factors, traffic considerations, physical elements, economic factors, and functional intersection area.  [Doc. 33-4, at 1-2.]  It further provides that the functional area on the approach to an intersection consists of perception-reaction distance, maneuver distance, and queue-storage distance.  [Id., at 2.]

In addition, Gomez identifies AASHTO provisions relating to "types and examples of intersections," and "three-leg intersections."  [Doc. 33-4, at 4-5.]  With respect to T-intersections, as denoted in a diagram, the normal pavement widths of both highways "should be maintained

14

except for the paved returns or where widening is needed to accommodate the selected design vehicle."  [Id., at 5.]

Gomez refers to AASHTO materials on "capacity analysis," that state "capacity and level-of-service analysis is one of the most important considerations in the design of intersections."  "The alignment and grade of the intersecting roads . . . should permit users to recognize the intersection and the other vehicles using it, and readily perform the maneuvers needed to pass through the intersection with minimum interference."  [Doc. 33-5, at 6.] Sight distance should be equal to or greater than the minimum values for specific intersection conditions . . . ."  [Id.]

Traffic control devices are discussed in the AASHTO materials including the suggestion that where such devices at an intersection are located outside the driver's line of sight, there may be a need to install advanced signing.  [Doc. 33-6, at 2.]  The materials provide that intersections on sharp curves should be avoided wherever practical due to complications and reduction of sight distance.  [Id.]

Gomez cites to and highlights a number of additional portions of the AASHTO materials that the Court reviewed but does not summarize here.  The point is that none of these AASHTO provisions mandate specific, non-discretionary action by the United States.  Clearly, these materials provide guidance, describe "general characteristics" of shoulders, for example, comment on what might be considered "well-designed and properly maintained shoulders," and discuss how certain designs are advantageous.  The materials, including those highlighted by Gomez, make suggestions and encourage consideration of some factors.  It is undeniable, however, that these are not "regulations" that are "sufficiently specific to remove decisionmaking under them from the discretionary function exception."  *See* Elder, 312 F.3d at 1177.  They do not dictate what actions the United States must take in response to specific problems.  The language in AASHTO, while

perhaps helpful, is suggestive by its nature, *e.g.,* "where practical," "ideally . . . should not be located," spacing "should reflect," drivers "should be able to see." [Doc. 33, exhibits.] Therefore, the Court determines that the AASHTO materials or provisions are not sufficiently specific to satisfy the first prong of the <u>Berkovitz</u> test. Other courts similarly found that the AASHTO materials do not impose inflexible code or directive. *See, e.g.,* <u>Riley v. United States</u>, 486 F.3d 1030, 1033 (8th Cir. 2007) (AASHTO provisions are guidelines and not mandatory); <u>Rothrock v. United States</u>, 62 F.3d 196, 199 (7th Cir. 1995) ("despite the alleged nonconformance with certain AASHTO standards, the [Federal Highway Administration] is charged with balancing a mix of factors such as cost and safety. This is inherently a discretionary judgment involving the balancing of a mix of policy factors").

### b.   *23 C.F.R. §§ 625.2(b),625.4*

Gomez relies on 23 C.F.R. § 625.2(b) that addresses standards for highways. Section 625.2(b) falls within the section identified as "Policy" and states that "[r]esurfacing, restoration, and rehabilitation (RRR) projects . . . shall be constructed in accordance with standards which preserve and extend the service life of highways and enhance highway safety." Such work "includes placement of additional surface material and/or other work necessary to return an existing roadway, including shoulders . . . to a condition of structural or functional adequacy." 23 C.F.R. § 625.2(b).

Gomez argues that 23 C.F.R. § 625.2(b) specifically states, "The standards, policies, and standard specifications cited in Section 625.4 of this part *contain specific criteria and controls* for the design of NHS projects." [Doc. 33, at 5] (emphasis added by Gomez). The current edition of the C.F.R. does not contain this language at § 625.2(b). However, it is possible the language was contained at § 625.3(a), (c) in an earlier edition applicable to the time frame here. Gomez further asserts that § 625.4 incorporates by reference AASHTO 2001, and, therefore, according to Gomez,

the CFR makes mandatory the AASHTO standards for changes to roads that are part of the NHS. [Doc. 33, at 5.]

The Court disposes of the second argument first because it already determined that the AASHTO materials do not dictate or mandate specific actions by the United States.  AASHTO provides guidance and materials for consideration, but it does not remove discretionary decision-making from the government.  Thus, Gomez did not demonstrate as she must that the government officials had no choice or judgment in making pertinent decisions.

With respect to the second argument, a federal district court reviewed the same position and rejected it.  Rothrock v. United States, 883 F. Supp. 333 (S.D. Ill. 1994), aff'd by, 62 F.3d 196 (7th Cir. 1995).  In Rothrock, the plaintiff, a motor vehicle accident victim, brought suit under the FTCA to recover for injuries allegedly caused by lack of guardrails on an interstate highway bridge.  The government moved to dismiss, and the Court held that decision regarding design and maintenance of a highway fell with the discretionary function exception.

The plaintiff, in Rothrock, relied on the same or similar CFR provisions, providing that "standards, policies and standard specifications contain specific criteria and controls for the design of highways." Id., at 335 (citing 23 C.F.R. § 625.3(a), (c)).  The plaintiff, like Gomez, contended that any deviation from such CFR standards or specifications constituted an actionable wrong under the FTCA.

The Court reasoned that while the CFR section provided some specific criteria, it did not constitute mandatory standards.  The Rothrock Court cited a Tenth Circuit decision in support of the finding that while portions of the CFR concerns specifics of engineering criteria for highways, "they are not prescribed mandatory standards . . . but are instead part of the overall regulatory scheme involving policy decisions and competing considerations."  Id. (citing Miller v. United

17

States, 710 F.2d 656, 666-67 (10th Cir.), *cert. denied*, 464 U.S. 939 (1983).  Moreover, the district court noted that the CFR in question directed the defendant to consider and balance many public policy factors in reviewing aspects of highway design and maintenance.  Id. at 336.

Similar to the decision in Rothrock, the Court decides that the CFR sections relied on by Gomez do not demonstrate that government officials had to act within the mandates of specific regulations or statutes.  Instead, the United States had discretion in making the decisions at issue.  Thus, Gomez failed to establish that the CFR provisions were so specific as to remove the government's discretion.  Accordingly, Gomez's reliance on the CFR sections do not satisfy the first prong of the Berkovitz test.

### c.   *Agreement between Defendants and State of New Mexico*

Gomez relies on a MOU that Defendants entered into with the State of New Mexico.  She contends that the MOU created additional non-discretionary obligations. [Doc. 33, at 6; Ex. 5.]  The MOU [Doc. 33-10, Ex. 5] was prepared in cooperation with the NMSH&TD, the Federal Highway Administration and the U.S. Dept. of Agriculture Forest Service.  It is a 18-page document with appendices.  Gomez contends that it imposed contractual obligations on Defendants.  More specifically, she cites page 14 of the MOU that states "The USFS shall . . . consult with the NMSH&TD District Engineer or their designated representative on matters pertaining to project construction."  She omits the next sentence that states the USFS shall respond to proposed changes within 15 calendar days.

Gomez also cites pages 15-16 of the MOU that state the USFS shall consult with the NMSH&TD on planned USFS activities which may have an impact on highway maintenance." [Doc. 33, at 6.]  She omits related paragraphs requiring USFS to review maintenance items requiring USFS concurrence with a certain time frame, assist the NMSH&TD maintenance forces with matters

18

related to equipment parking and materials storage, etc., and review the NMSH&TD's requests for use of chemical applications. Gomez further emphasizes page 17 of the MOU that states Defendants agreed that NMSH&TD and USFS "shall jointly review and agree to the location, design, and perpetuation of all highway turnouts, widening for viewpoints, historical and interpretative signing, rest areas . . . ."

Gomez's position is that no evidence demonstrates that the government engaged in the joint review or required consultation with NMSH&TD as required in the MOU before Defendants conducted the project construction in 2004 that altered the Highway 64 driveway turnout. Gomez contends that these portions of the MOU created non-discretionary duties that the government did not follow.

The United States disagrees with Gomez's contentions, arguing, in part, that it provided evidence showing that the Forest Service consulted with New Mexico Department of Transportation in designing the renovation of the El Nogal parking lot before the 2004 renovation. [Doc. 34, at 2.]

However, the critical inquiry is whether the MOU provisions mandate non-discretionary actions by Defendants. The Court concludes that the MOU does not require or dictate that the government take specific actions. Rather, as stated in its introduction, the MOU establishes procedures for *coordinating* matters related to state highway use and occupancy of National Forest System lands. [Doc. 33-10, at 1.] The MOU discusses planning, project development, parties to be included, and agency cooperation and roles. With respect to certain projects, the State and Forest Service are to mutually agree to certain procedures. However, the MOU does not mandate that the United States abide by specific standards or requirements.

The Court concludes that the MOU contemplates the government's use of discretion and judgment in the construction, reconstruction, and maintenance of project work. The MOU provides

that the parties consult with another and respond to various proposed changes.  Thus, it does not set forth standards that the government must abide by; rather, it envisions cooperation among agency personnel.  For example, NMSH&TD engineers and Forest Service supervisors "are encouraged to confer and reach agreement on all matters within their scope of responsibility."  Unresolved problems and matters that require consideration or approval at a different level are referred to higher ranking personnel in the agencies.  [Doc. 33-10, at 17.]

In sum, the MOU does not prescribe a mandatory course of conduct that the government had to follow without discretion to make its own proposals or judgment-calls.  It does not remove the government's choice or judgment and does not sufficiently prescribe a course of action for federal employees to follow other than to require interagency cooperation.  Thus, the Court finds that the MOU does not defeat the first prong of the Berkovitz test.

### d.   _Manual on Uniform Traffic Control Devices ("MUTCD")_

Gomez states that the MUTCD controls the proper placement and safe use of signs, including the location of stop signs to control traffic entering a highway.  [Doc. 33, at 7; Doc. 33-9 (Ex. 4).]  Gomez contends that when Defendants altered the driveway turnout at El Nogal, they moved the stop sign controlling access to the highway.  According to Gomez, the MUTCD allowed for no discretion in requiring the sign placement be optimized for visibility.  Specifically, Gomez cites, _inter alia,_ § 2B.06 (STOP Sign Placement), stating that the "STOP sign shall be located as close as practical to the intersection it regulates, while optimizing its visibility to the road user it is intended to regulate."

The very language of the MUTCD on which Gomez indicates judgment calls are made.  In other words, the MUTCD discusses "engineering judgment" [Doc. 33-9, § 2B.05], an employee is called upon to locate the STOP sign "as close _as practical_ to the intersection," the employee must

attempt to "optimize its visibility" and decide what road user the sign is intended to regulate. (emphasis added.)  Again, such language does not mandate a specific location for the STOP sign, without reference to the employee's judgment in terms of other pertinent matters.

The Court concludes that the MUTCD does not create mandatory requirements that remove all discretion or choice from the United States' obligations in providing proper and adequate signage in various locations.  No statute, regulation or policy specifically prescribed a course of action for government employees to follow that eliminated those employees' discretion.  Thus, the Court finds that the MUTCD provisions do not defeat the first prong of the Berkovitz test.

> B.   Whether governmental conduct was grounded in policy or susceptible to policy analysis

Gomez argues that Defendants' decisions impacted a highway that was controlled by very specific standards and that such decisions were not susceptible to policy analysis.  [Doc. 33, at 8-9.] She contends that policy factors cited by Defendants cannot trump regulations, standards, and contractual agreements that control construction and maintenance of a highway.  For example, Gomez asserts that traffic study data could not amount to mere policy considerations; rather, traffic danger was the paramount issue.  Traffic studies, therefore, were not an option susceptible to policy analysis.  They had to be done.  In addition, Gomez asserts that the United States did not have the discretion to "ignore" signage rules where traffic safety is a serious concern.  Similarly, Gomez argues that the United States had no discretion to determine whether removal of brush and tree was nothing more than a policy decision susceptible to discretion where public health and safety concerns necessitated action.  [Id., at 10.]

With respect to this second prong of the test, the question is "whether [the United States'] judgment is of the kind that the discretionary function exception was designed to shield."  Elder, 312

F.3d at 1180-81 (citation omitted).  "Only decisions susceptible to policy analysis are protected by the exception.  Id. (citation and quotation marks omitted).  In Elder, the Tenth Circuit instructed that the pertinent inquiry was whether the government's decision "implicates the exercise of a policy judgment of a social, economic, or political nature."  Id. (citation omitted).

The Supreme Court, in Gaubert, clarified the second prong of the test.  The subjective intent of a particular actor is not at issue.  The Court need not find that a government employee made a conscious decision regarding policy considerations in order to satisfy the second prong.  Gaubert, 499 U.S. at 325; Lopez v. United States, 376 F.3d 1055, 1057 (10th Cir. 2004).

In Gaubert, the Court also advised that "if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations.  Gaubert, 499 U.S. at 324.

In Lopez, the Tenth Circuit noted that "[t]o be sure, there is no clean distinction between decisions susceptible to 'policy analysis' and those that are not."  Lopez, 376 F.3d at 1060.  In Lopez, the Court explained that the federal government could be held liable under the FTCA in Boyd v. United States, 881 F.2d 895, 898 (10th Cir. 1989), where the government failed to warn swimmers in a lake of the hazards posed by boats.  Id.  That was true, in part, because the Court determined that an "alleged failure to warn swimmers of dangerous conditions in a popular swimming area does not implicate any social, economic, or political policy judgments with which the discretionary function exception properly is concerned."  Boyd, 881 F.2d at 898.

Here, the Court determines that the government's decisions regarding renovation of the trailhead parking lot, maintenance of trees and shrubs, and conducting appropriate traffic and engineering studies are susceptible to policy analysis.  Given competing interests on use of public

lands under MUSYA, and the need to consider national environmental policy considerations under NEPA, choices must be made. Part of the policy and safety considerations at issue in relation to the 2004 construction concerned problems with the public frequently parking on the shoulder of Highway 64. Parking along the highway posed a danger to the public. The government made discretionary and policy-related decisions to modify the parking lot that would provide convenient and safe access to trails. [Doc. 29-3.] Addition, the 2004 changes to the parking lot addressed environmental concerns, as demonstrated by Defendants. For example, the renovations intended to reduce adverse effects on the Rio Fernando de Taos floodplain and reduce impact on affected wetlands and stream banks. Thus, some of the old campground was closed, fire rings and picnic tables were removed, and the parking area was made smaller and moved away from more fragile, stream side areas. The government re-surfaced the parking lot area with gravel for purposes of minimizing the extent of impermeable ground within the floodplain and riparian wetland. [Id.]

In addition, the government provided affidavit testimony from Steve Okamoto, who had extensive history and knowledge in reference to the area at issue and similar projects/issues. Mr. Okamoto testified that the Forest Service does not typically change the location of a pre-existing entry point to a highway, unless there is an issue that needed to be addressed, such as a history of accidents or other concerns. According to Mr. Okamoto, neither the Forest Service law enforcement or pertinent Ranger District had records of an accident at this location before Gomez's accident. No one in the Carson National Forest, some of whom worked there for over 25 years, recalled an accident at this location. Mr. Okamoto further testified that the Forest Service does not change the entry point to a highway because such changes could require unnecessary destruction of forest land and could interfere with forest objectives, including the unnecessary expenditure of funds. [Id.]

Mr. Okamoto also provided testimony and supporting documentation that in renovating a trailhead parking lot, including the decision not to move the existing driveway, placement of signs, and cooperation with NMSH&TD, required the Forest Service to consider and weigh several policies and objectives important to the Forest Service and the management of the forest.  For example, such policy concerns included goals of the project, health and safety, construction and maintenance costs, costs versus benefits, impact on wildlife, impact on watershed and vegetative resources, site damage, management and vehicular and pedestrian traffic, and environmental or cultural impacts.  [Id., and exhibits.]

In evaluating the second prong of the Berkovitz test, the Court keeps in mind that it is not to engage in judicial second guessing of legislative and administrative decisions if they are grounded in social and economic policy.  In addition, having found that pertinent manuals and regulations allowed for employee discretion, it is presumed that the agent's acts are grounded in policy when exercising such discretion.  Indeed, some of the materials Gomez relies on specifically reference "policy."  See, e.g., 23 C.F.R. § 625.2 ("Policy").  Further, the Court  acknowledges that exceptions to immunity are to be strictly construed.  See Pipkin v. United States Postal Serv., 951 F.2d 272, 275 (10th Cir. 1991) ("The FTCA represents a waiver of the United States' immunity and must, therefore, be strictly construed.") (citation omitted).

Here, the Court finds that the government acted in furtherance of policy concerns in renovating and maintaining the parking lot at issue.  For all of the above-stated reasons, the Court concludes that the government's decisions in relation to allegations of this case are susceptible to policy analysis.  Therefore, the second prong of the Berkovitz test is satisfied with the result that the government is entitled to the protection of the discretionary function exception to a waiver of immunity.

## **Conclusion**

IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss Plaintiffs' Complaint for Lack of Subject Matter Jurisdiction [Doc. 29] is GRANTED. Accordingly, Plaintiffs' Complaint and all claims are dismissed with prejudice.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge